PAQUIN et al. v. MILLIKEN, Appellant.

Division Two, May 21, 1901.

1. **Fraud in Obtaining Contract:** CANCELLATION: DAMAGES. If a party, as soon as he discovers the fraud which entered into the contract of dissolution and sale of the other's interest in their co-partnership, brings suit in equity to enjoin any further effort to collect the consideration notes for the sale, he is not remitted to his legal action for damages, but his equitable proceeding is timely.

2. ———: ———: PREVIOUS SUIT: ELECTION: ESTOPPEL. Where plaintiff in a prior suit on a note which entered into the consideration for the dissolution and sale of the payee's interest in a co-partnership, pleaded a failure of consideration and breach of the contract after its execution, and set up a counterclaim for damages by reason of such failure, he did not thereby waive his right to rescind the contract of dissolution and sale and have the notes cancelled in equity upon a subsequent discovery that fraud had entered into the execution of the contract.

3. ———: ———: SALE OF GOOD WILL: FRAUD. Where one partner sells the good will of the partnership to the other, and as a part of the consideration agrees to not engage in the same business for a year and to do nothing directly or indirectly to interfere with the sale and manufacture of the article which is the basis of the business, but at the very time the contract was made had already entered into an agreement with another to undermine and destroy the business thus sold, his action is a fraud, and if a timely suit is brought to cancel the notes which were given in payment of his interest in the partnership, it will be sustained.

4. ———: ———: IN TOTO: STATUS QUO: DEFENDANT'S FRAUD: ACCOUNTING. As a general rule, a court of equity will not decree the cancellation of a contract unless it can do so in toto and restore the parties to the *status quo* existing when the contract was made. But the fact that this can not be done will not prevent a cancellation if the condition results from the fraud of the defendant and without

fault of plaintiff. Where the court can not restore the *status quo* because of the fraudulent conduct of defendant, his fraud will not bar plaintiff's right to such equitable relief as the court under the circumstances may be able to award him. If the prayer is for the cancellation of certain notes which were given as a part of the consideration for a contract of dissolution of a co-partnership and a sale of defendant's interest therein, it is not necessary for plaintiff to offer to restore to defendant a membership in the partnership or the property of the partnership which has been consumed by plaintiff in ignorance of the fraud defendant had perpetrated on him in obtaining the execution of the contract of dissolution and sale. Especially is this the rule, if along with his prayer for cancellation, the plaintiff also seeks an accounting.

5. ———: ———: ———: ACCOUNTING: NOTES: RESTORATION OF CASH PAID. Where plaintiff asks for a cancellation of a contract which has become valueless because of a fraud perpetrated by defendant before the contract was executed, and for the cancellation of certain notes which made up a part of the consideration for the contract, and for an accounting and a refunding of the cash received by him at the time the contract was executed, plaintiff will not be denied a decree cancelling the contract and notes simply because no accounting can be had, nor will that decree be interfered with simply because it did not decree a return of the cash paid. Defendant can not complain because plaintiff recovered less than he was entitled to.

6. **Equity:** REMEDIES. Equity does not require the same decree in all cases. It has a variety of remedies, and is capable of being adjusted to the circumstances of each case.

## Appeal from St. Louis City Circuit Court.—*Hon. Jacob Klein,* Judge.

AFFIRMED.

*Boyle, Priest & Lehmann* and *Geo. W. Easley* for appellant.

(1) If all that plaintiffs contend for be conceded, the decree is erroneous. They can not disaffirm the contract for the alleged fraud, keep what they received under the contract,

Paquin v. Milliken.

and rescind as to the payments they agreed to make. One who would rescind a contract must put or offer to put the other party *in statu quo*. Robinson v. Siple, 129 Mo. 208. Plaintiffs can not "hang on" to the property received under the contract and have it rescinded. Jarrett v. Morton, 44 Mo. 275; Burton v. Stewart, 3 Wend. 236. The restoration to the *status quo* is a condition precedent to the right of rescission. Milton v. Smith, 65 Mo. 315; Buford v. Packet Co., 69 Mo. 11; Bigelow on Frauds, p. 411; 1 Beach Modern Contracts, secs. 792, 793; 1 Sto. Eq. (Redfield's Ed.), sec. 707. This rule is of universal application. 18 Enc. Pl. and Pr., title "Rescission," p. 829; Baird v. Mayor of N. Y., 96 N. Y. 599; Bishop on Con. (Enlarged Ed.), sec. 679; Walker v. Pogue, 2 Col. App. 149, 29 Pac. Rep. 1017. (2) Even in cases where rescission is proper, it must be *in toto*. It can not be partial. It could not properly be adjudged, as was done by the decree in this case, "that the contract of November 7, 1895, be rescinded so far as the three promissory notes are concerned" and remainder of the contract left in force. Masson v. Bovet, 1 Denio, 69, 43 Am. Dec. 651, and cases collected in note, p. 654; Neal v. Reynolds, 38 Kan. 432, 16 Pac. Rep. 785; 18 Enc. Pl. and Pr., title "Rescission," p. 858. (3) Not having elected to rescind within a reasonable time, and not offering to return the property received, the plaintiffs must be remitted to their recovery of damages in an action at law for breaches of contract. Their petition should have been dismissed without prejudice to such action. McCulloch v. Scott, 13 B. Mon. 172; 56 Am. Dec. 561. (4) Plaintiffs by pleading the failure of consideration "and a counterclaim for damages by reason of such breaches" waived the right to rescind, and elected to keep the property received by them and rely upon their counterclaim for damages. Keer on Fraud & M. (Bump's

Vol 163 mo—6

Ed.), 328.   The fact that plaintiffs claim to have discovered the actual execution of the contract with Crandall after filing their answer and counterclaim in the action on the notes does not revive the right to rescind.   That was a mere incident of the alleged fraud which can not authorize them to set aside their former election to abide by the contract, keep the property and recover or recoup their damages.   Taylor v. Short, 107 Mo. 385.   (5) The allegation and proof as to defendant decrying the value of the serum produced under Dr. Paquin's formula, gives no just ground for rescinding the contract of sale.   Those were matters occurring after the execution of the contract of sale.   It is only fraud, at the time of the execution of the instrument sought to be rescinded, that is ground for rescission.   Subsequent frauds are only the bases of actions for damages.   If the defendant fraudulently suppressed the contract with Dr. Crandall, that fact alone worked no injury to plaintiffs.   It was the subsequent acts, if any, that injured the plaintiffs.   It was the breach of the covenants that gave plaintiffs a right of action.   Such action is at law, not in equity.   18 Enc. Pl. and Pr., title "Rescission," p. 807. These subsequent acts, of whatever nature, are not grounds for rescission.   Chesteman v. Gardner, 5 Johns. Ch. 29.   Even if it be found that the defendant intended to break his covenants when he made them, it is no ground for rescission.   Value v. Taylor, 136 Ind. 368, 36 N. E. 271.

*Chester H. Krum* for respondents.

Rescission of the contract, as far as it could be done, was a feature of the proceeding, but the respondents merely sought and obtained such relief as the facts warranted in the case made by the evidence.   That a gross fraud had been practiced upon them goes without saying.   The situation in which that

fraud left them was, forsooth, peculiar, but it was a situation brought about by the fraud of the appellant. The only adequate remedy which they had was in equity. The trial court found as a fact that the respondents were not aware of the fraud of the appellant when they made the contract. At once, upon the discovery of the fraud, they proceeded to have their situation remedied as far as could be done under the circumstances. It was with them as in many a case of relief sought where fraud has been practiced. They sought, the only relief which could be afforded in view of their situation. Bishop on Contracts, secs. 830 and 831. It is, indeed, familiar doctrine that any contract, the making of which is induced by the fraud of either party, practiced upon the other at the time when the contract is made, or while negotiations in regard to it are going on, is voidable and may be rescinded at the election of the party defrauded. Hickey v. Drake, 47 Mo. 369. It is no less familiar, that as a rule general in its application, equity will not decree rescission unless the applicant for relief can put his adversary *in statu quo*, by surrendering, or offering to surrender, what he obtained under the contract. But while the rule is sweeping in its application and may be said to be universal, yet the conduct of the guilty party may have been such as to render it inapplicable in a particular case. Equity will not, and does not require the performance of impossibilities, because of the maxim, that he who seeks equity must do equity. If placing the offending party *in statu quo* has been rendered impossible by his act or omission, rescission will be had notwithstanding the impossibility. Robinson v. Siple, 129 Mo. 208; Hammond v. Pennock, 61 N. Y. 145; Masson v. Bovet, 1 Denio, 69; Downer v. Smith, 32 Vt. 1; Carlon v. Roemer, 52 N. J. L. 53; Coffee v. Ruffin, 4 Cold. (Tenn.) 487; Hendrickson v. Hendrickson, 51 Iowa, 68; Myrick v. Jack, 33 Ark. 425.

GANTT, J.—This is a suit in equity for the cancellation of three certain notes executed by Paul Paquin and Robert L. Owen to defendant Milliken.

The original petition was filed July 1, 1897, and a temporary injunction granted. On July 6, 1897, the temporary injunction was continued in force. The cause was heard upon an amended petition filed December, 20, 1897, at which time "The Paul Paquin Laboratories Company," a corporation, was added as a party plaintiff.

The petition, though lengthy, sets forth the facts upon which plaintiffs sought relief and its reproduction will obviate any other statement of the case on the part of plaintiffs. It is in these words:

"By leave of court, the plaintiffs file their amended petition, and state that heretofore, to-wit, on the thirty-first day of January, 1895, the defendant and the plaintiff, Paul Paquin, entered into the following agreement of partnership, to-wit:

" 'These articles of co-partnership, made and entered into this thirty-first day of January, 1895, by and between Paul Paquin of the city of St. Louis and State of Missouri, of the one part, and John T. Milliken of the same place, of the other part, witnesseth:

" 'First. The said parties hereby form a co-partnership which shall continue from the day of the date hereof, until dissolved by mutual consent.

" 'Second. The said co-partnership is formed for the purpose of manufacturing and selling serum for the cure of tuberculosis, according to the formula and discovery of the said Paquin, and according to any improvements that he may hereafter make or discover in connection therewith.

" 'Third. The said Paquin contributes as his portion of the capital, of said co-partnership, his said discovery and formula for the manufacture of serum for the purpose aforesaid,

and any improvement or improvements that he may hereafter make or add thereto.

" 'Fourth. The said Milliken, on his part, contributes the amount of ten thousand dollars cash money, to said co-partnership as his share of the capital thereof.

" 'Fifth. The said Paquin is to reduce his formula and the method of preparing serum for the cure of tuberculosis according to said formula and his said discovery, to writing, and the said writing, it is agreed by the parties hereto, shall be placed in a box, to be rented for that purpose, of the Missouri Safe Deposit Company in the city of St. Louis, to which box each of the parties hereto shall have one key, and to which box either, during their joint lives, and the continuance of this co-partnership, shall have access, but only in the company of the other.

" 'Sixth. The said Paquin shall devote all the time necessary to the manufacture and preparation of the said serum, in quantities as required, or shall superintend its preparation and manufacture, and with the said Milliken, devote sufficient time towards bringing about the sale thereof, as a commercial article. The said Paquin shall have charge of the laboratory work, and of the experimental work, either by himself or through assistants whose work he shall superintend.

" 'Seventh. The first ten thousand dollars of profit realized by the co-partnership shall belong to and be paid over to said Paquin. Thereafter, all profits that may be realized shall be divided in the proportion of four-fifths to said Paquin and one-fifth to said Milliken.

" 'Eighth. Losses, if any, in the said co-partnership business, shall be divided and borne in the proportion aforesaid.

" 'Ninth. Correct books of account shall be kept, correctly recording all co-partnership transactions, setting forth

correctly all the moneys received and paid out by the said co-partnership, and said books shall at all times be open to the inspection of either partner.

" 'In witness whereof, the said parties have hereunto set their hands to duplicate copies hereof, at the city of St. Louis, the day and year first aforesaid.

" 'PAUL PAQUIN.
" 'JOHN T. MILLIKEN.'

"That afterwards, to-wit, on the twenty-seventh day of March, 1895, the said contract was modified by the parties thereto, as follows, to-wit:

" 'By mutual consent and for a valuable consideration, the foregoing agreement has been, and hereby is modified, so as to give the said John T. Milliken a two-fifths interest in the profits instead of a one-fifth interest as stated in paragraph 7, and said Milliken shall take an active part in the prosecution of the co-partnership business.

" 'St. Louis, March 27, 1895.

" 'PAUL PAQUIN, M. D.
" 'JOHN T. MILLIKEN.'

"That afterwards, to-wit, on the tenth day of June, 1895, the said contract was further modified by the parties thereto, as follows, to-wit:

" 'By mutual agreement, and in consideration of an additional sum of five thousand dollars, invested in said co-partnership business by John T. Milliken, he is henceforth an equal partner with the said Paul Paquin, and entitled to an equal one-half of the profits, and shall act as, and be, the business manager of the said co-partnership affairs.

" 'St. Louis, Mo., June 10, 1895.

" 'PAUL PAQUIN, M. D.
" 'JOHN T. MILLIKEN.'

"That under the said contract and the modifications

thereof, the operations of the said partnership thereby created were carried on until the seventh day of November, 1895, when the said partnership was dissolved, and the interest of the said defendant therein transferred to the plaintiff, Paul Paquin, by means and by virtue of the following agreement then and there entered into by the said parties, to-wit:

" 'This agreement, made by and between John T. Milliken, party of the first part, and Paul Paquin, party of the second part, both of the city of St. Louis, Mo., witnesseth:

" 'That the party of the second part, for and in consideration of the covenants and agreements hereinafter set forth, to be kept and performed by the party of the first part, to and with the party of the second part, and of the sale and transfer hereinafter mentioned, has paid to the party of the first part the sum of twenty-two thousand seven hundred and fifty dollars, the receipt whereof is hereby acknowledged. And the party of the first part, in consideration thereof, agrees to make and hereby does make the covenants and agreements hereinafter set forth, to and with the party of the second part, and the sale and transfer following, that is to say: The party of the first part hereby bargains, sells, transfers and sets over unto the party of the second part, all of his right, title and interest of every kind and character in the firm of John T. Milliken & Company, including the formula and process of manufacturing and preparing antitubercule serum under said formula and process, and subsequent improvements, the same being the formula of Doctor Paul Paquin, together with the assets, credits and effects of said firm, consisting of cash in bank, the eighteen horses immunized and now in the stable of the sanitarium owned by the firm on Grand avenue in the city of St. Louis, together with the sanitarium, the lease thereof, the furniture, fixtures and carpets, the laboratory thereof and its contents, and the typewriters, desks, safe, furniture and appliances, as well as open accounts, credits,

effects, books, letters, correspondence, advertisements, stationery and literature of every name or nature, kind, character, or description including the books of clippings and papers, medical journals, contracts, letter-books, letter-files, testimonials, certificates of every kind or character, and address-books of said firm, in short, all and singular the property, assets, credits and effects, including the good-will of the firm of John T. Milliken & Company, of every kind or character, so that the said party of the second part shall have, hold, and possess the same, free and clear from all claims of the party of the first part, or of any other person or corporation whomsoever.

" 'The party of the first part, for himself, his heirs, successors and assigns, for the consideration aforesaid, hereby covenants·and agrees to and with the party of the second part as follows, to-wit:

" 'First.    The party of the first part covenants and agrees to and with the party of the second part, his heirs, successors and assigns that no claim of any kind or character, by any person or corporation whomsoever, shall be made against the property of said firm, the partnership assets or the formula of said firm, or the business thereof.

" 'Second.    The party of the first part covenants and agrees to and with the party of the second part, his heirs, successors and assigns, for the consideration aforesaid forever, not to engage himself either directly or indirectly, in the manufacture, preparation, distribution or sale of serum in any way, mode, or manner, for the treatment of tuberculosis, or pulmonary consumption under the Paquin formula; and further covenants and agrees, for the consideration aforesaid, to and with the party of the second part, that he will not use, forever, directly or indirectly, the Paquin name in connection with the manufacture, preparation, distribution or sale of any kind of serum in any way, mode or manner for the treatment of tuberculosis, or pul-

Paquin v. Milliken.

monary consumption, or for any other disease; and the party of the first part, for the consideration aforesaid, hereby covenants and agrees to and with the party of the second part, that he will never use, in the prosecution and carrying on of the business of manufacturing, preparing, distributing, or selling any kind of serum, in any mode or manner, for the treatment of tuberculosis or pulmonary consumption, the name or designation of "Anti-Tubercule Serum."

" 'Third. · For the consideration aforesaid, the party of the first part hereby covenants and agrees to and with the party of the second part, his heirs, successors and assigns, for a period of one year next after the date of this agreement and contract, that he will not engage in the United States, in the manufacture, preparation, distribution or sale of any kind of serum in any way, mode or manner, for the treatment of tuberculosis or pulmonary consumption.

" 'Fourth.   The party of the first part, for the consideration aforesaid, further covenants and agrees to and with the party of the second part, his heirs, successors and assigns, and binds himself that for the period of one year from the date of this agreement and contract, he will remain out of the business of manufacturing, preparing, selling or distributing any kind of serum, substance or fluid for the treatment of tuberculosis or pulmonary consumption, and during that time, in said country, will not make himself, or through any person or corporation, any researches, studies or experiments of any kind or character, aiding or encouraging the same, or in the connection therewith; and the party of the first part further covenants and agrees, for the consideration aforesaid, to and with the party of the second part, his heirs, successors and assigns, and binds himself for the period of one year, in the United States, from the date of this contract or agreement, not to offer or furnish himself, or through any other agency, or in any manner or form, financial

aid or business encouragement or assistance, directly or indirectly, to any person or corporation to do the same.

" 'Fifth. For the consideration aforesaid, the party of the first part hereby covenants and agrees to and with the party of the second part, his heirs, successors and assigns, that he will not disclose to any person or corporation whomsoever, all, or any part, portion or particular, of the contents, ingredients and constituent elements of the Paquin "Anti-Tubercule Serum" formula; and the party of the first part, for the consideration aforesaid, further covenants and agrees to and with the party of the second part, that the original copy of said formula, intrusted to him by the party of the second part, and which is now delivered by him to the party of the second part, is the only copy hereof in his possession or custody, or under his control, directly or indirectly; and for the consideration aforesaid, the party of the first part further covenants and agrees to and with the party of the second part, his heirs, successors and assigns, that all and every copy of all or any part, portion or particular of the same, by him or any other person whomsoever made, which is now in the possession of the party of the first part, or under his control in the possession of any other person whomsoever, shall be and is now delivered unto the party of the second part.

" 'The two parties to this agreement and contract hereby dissolve by consent the firm between Paquin and Milliken, known as John T. Milliken & Company, heretofore established under and in pursuance of a certain contract made and entered into by and between the parties to this agreement and contract, and dated on the thirty-first day of January, 1895, and additions thereto.

" 'In witness whereof, the parties hereto have hereunto set their hands and seals in duplicate this November 7, 1895.

" 'JOHN T. MILLIKEN.    (Seal.)

" 'PAUL PAQUIN.    (Seal.)

" 'State of Missouri, ⎞
   City of St. Louis, ⎠ ss.

" 'Personally appeared before me, the undersigned notary public within and for the city and State aforesaid, John T. Milliken and Paul Paquin, to me known to be the parties described in and who executed the foregoing instrument of writing, and acknowledged the same to be their free and voluntary act and deed. In witness whereof, I have hereunto set my hand and official seal this November 7, 1895.

               " 'Geo. W. Wadlow, Notary Public.'

"That prior to the execution of said contract of dissolution and sale aforesaid, the plaintiff, Robert L. Owen, was made aware of the intent of said defendant and said plaintiff, Paul Paquin, to terminate their said contract, and was made acquainted with the proposed terms of said agreement of sale and dissolution, which, as communicated to said plaintiff Owen, was the same as afterwards were embodied and set forth in the said agreement.

"That upon the faith of the proposed execution of said agreement and the covenants of said defendant to be expressed therein, the said plaintiff Owen, as defendant then and there well knew, arranged with said plaintiff Paquin to become interested with him in the business to be acquired by said Paquin by virtue of said agreement.

"That accordingly, as said defendant then and there well knew, upon the execution of said agreement, said plaintiff Owen advanced for the account of plaintiff Paquin, and caused to be paid to the said defendant, the sum of fifteen thousand dollars, the whole of the cash portion of the consideration of twenty-two thousand and seven hundred and fifty dollars, and together with said plaintiff Paquin, made and delivered to said defendant, as

the balance of the said consideration, three negotiable promissory notes all bearing even date with said last named agreement, each for the sum of twenty-five hundred dollars, and respectively payable to the order of said defendant in one, two and three years from date.

"That the principal and controlling feature of the business conducted by said defendant and said plaintiff Paquin, under their agreement of partnership first herein set forth, was the manufacture and sale of 'Anti-Tubercle Serum,' and the main consideration moving the said plaintiff Paquin to execute said agreement of dissolution and sale, leaving the same plaintiff Owen to advance said money as aforesaid, and leaving the said plaintiffs to make the said notes, was the covenants and undertakings of said defendant, expressed in said agreement, and upon which they placed full faith and reliance.

"That on the said seventh day of November, 1895, after the execution and delivery of said contract of sale, from said defendant to Paquin, the plaintiff Paquin, by agreement in writing of that date, sold and delivered upon good and valuable considerations therein expressed, to the said plaintiff Owen, a one-half interest in and to the processes and formulas mentioned in, referred to and transferred by the agreements between said defendant and the said plaintiff Paquin, hereinbefore set forth.

"That after said seventh day of November, 1895, and after the transfer last recited from the plaintiff Paquin to the plaintiff Owen, the said plaintiff Paquin and said Owen continued the business of manufacturing, producing and selling 'Anti-Tubercle Serum,' and employed therein the property acquired under the said contract of dissolution by plaintiff Paquin from said defendant; that the said business was carried on under the name of the Paul Paquin Laboratories, and was continued down to about the first day of March, 1896.

"That on or about the first day of March, 1896, the said

plaintiffs Paquin and Owen, for the purpose of further main-
taining and carrying on the business of manufacturing, produc-
ing and selling 'Anti-Tubercle Serum,' and for the purpose of
further enjoying the processes, formulas, and so forth, acquired
from said defendant, and relying upon and having full faith in
the covenants, stipulations and assurances of the said defendant
in said agreement expressed as aforesaid, caused a corporation
to be created and organized under the laws of this State, with a
capital stock of ten thousand dollars, divided into one hundred
shares of the par value of one hundred dollars each, and entitled
The Paul Paquin Laboratories Company, which is the corpor-
ation now a party plaintiff to this suit.

"That of the said capital stock said plaintiffs became sub-
scribers to and were the owners of ninety-seven shares, and are
now and have been, since the organization of said corporation,
in control, ownership and management of the said corporation.

"That on or about the tenth day of March, the said plain-
tiffs, Paquin and Owen, transferred and assigned unto said
corporation plaintiff the property acquired under the said con-
tract between the defendant and said plaintiff, Paul Paquin, of
date November 7, 1895, and the said plaintiffs, Paquin and
Owen, as stockholders and officers are not only in control of the
said corporation, but they constitute it, and own its properties,
assets and effects.

"That neither before nor at the time of the execution of
said contract of sale from said defendant to plaintiff Paquin,
did either the said plaintiff Paquin or the said plaintiff Owen
have any knowledge or information in regard to the contract
between the defendant and G. C. Crandall, of date November
4, 1895, and hereinafter set forth; that none of the persons who
became stockholders in the said corporation, at the time when
said corporation was organized, had any knowledge that such
contract had been executed between the defendant and said

Crandall, and that neither of said persons received any such information until about the time hereinafter indicated.

"The plaintiffs state that one of the said notes given by them to said defendant, to-wit, that one payable one year after date, matured November 9, 1896, and upon refusal of plaintiffs to pay the same, because of violation by defendant of the said agreement of November 7, 1895, as hereinafter shown, suit upon the same was brought by defendant against plaintiffs, which is now pending in the circuit court of St. Louis county, and set for trial on the seventh day of July, 1897.

"That in their answer to the action upon the said note at the time when it was filed, being advised and informed only of breaches of said agreement of November 7, 1895, by defendant, after its execution, the plaintiffs pleaded failure of consideration and a counterclaim for damages by reason of such breaches.

"That since the filing of said answer, and within the last ten days of the present month of June, 1897, prior to this suit, the plaintiffs became aware, and for the first time learned of the frauds of said defendant perpetrated upon them, as hereinafter stated, before the execution of said agreement of November 7, 1895, before the payment of the cash consideration and before the making of the notes then made.

"That shortly prior to the execution of said agreement of November 7, 1895, craftily intending to avoid the operation of said agreement when executed, and for the purpose of defrauding plaintiffs, said defendant, without knowledge of plaintiffs, secretly entered on the fourth day of November, 1895, into the following agreement with one G. C. Crandall, to-wit:

" 'This agreement, made and entered into this fourth day of November, 1895, by and between John T. Milliken of the one part, and G. C. Crandall, M. D., of the other part, both of the city of St. Louis, Mo., witnesseth:    That whereas, here-

tofore an agreement and understanding was had between the said parties pursuant to which the said parties with the aid and assistance pecuniarily of the said Milliken, has been and still is prosecuting experiments in immunizing horses, for the purpose of discovering an anti-toxine, for the treatment or cure of tuberculosis and diphtheria and other kindred diseases; and whereas, the said Milliken is negotiating with Paul Paquin, M. D., of the city of St. Louis, for the dissolution of a co-partnership now existing between them, under and by the terms of which dissolution the said Milliken is to agree that he will not, for the period of one year thereafter, engage in the business directly or indirectly, of manufacturing, placing upon the market, or selling any anti-tubercle serum, or any other specific for the treatment or cure of tuberculosis, nor to give aid or encouragement to any such business; therefore, it is hereby agreed by and between the parties hereto, that the said Crandall shall, during the period of one year, next ensuing, after the consummation of the agreement between the said Milliken and the said Paquin, prosecute at his own costs and expense the said experiments in which he is now, and for sometime past has been engaged, without any aid whatever from the said Milliken; but in consideration of the aid, assistance and funds heretofore already furnished by the said Milliken, and which have heretofore already materially aided the said Crandall in his experiments and pursuits, he, the said Crandall, does hereby covenant and agree that after the lapse of said year, the said Milliken shall have a three-fourths undivided interest in any discovery which he may make in the direction aforesaid, and three-fourths of any profit which may result therefrom or from the sale thereof. And, it is further understood and agreed that after the lapse of said year, if the said experiments shall result in the discovery of any formula or anti-toxine, that the said parties hereto shall be interested in, in the manner aforesaid,

that is, three-fourths to said Milliken, and one-fourth to said Crandall in any co-partnership, corporation or company that may be formed or organized, to place the same upon the market or upon a commercial basis. In witness whereof, the said parties have hereto set their hands to duplicate original copies hereof, the day and year first aforesaid.

" 'JOHN T. MILLIKEN,

" 'G. C. GRANDALL.'

"That said contract was designed by defendant, so that it might appear that he intended to keep faith with plaintiffs, while in reality he intended to violate his contract of sale as soon as it was made.

"That even in the month of September, 1895, without the knowledge of the plaintiff Paquin, with cause, for the purpose of defrauding him, and in violation of the said partnership agreement of January 31, 1895, the said defendant had already employed the said Crandall to make experiments for him, defendant, in the production of anti-tubercle serum, and shortly prior to the said dissolution with plaintiff Paquin, placed at the disposal of said Crandall ample funds to carry on the work called for by the said contract of November 4, 1895, hereinbefore last set forth, and with which such work was thereafter carried on and of which facts and fraudulent purposes of defendant, neither of the plaintiffs had knowledge at the time of the execution of the contract of dissolution and sale of November 7, 1895.

"That with the funds thus provided by defendant, the said Crandall, for and in behalf of defendant, made and contracted experiments in producing anti-tubercle serum, and within the year ending in November 7, 1896, at the same instance and for the benefit of said defendant, did produce, use and employ as an agency in the treatment of tuberculosis anti-tubercle serum.

Paquin v. Milliken.

"That, after the execution of said contract of November 7, 1895, the said defendant, although he had covenanted and agreed with said plaintiff Paquin, his heirs, successors and assigns, not to engage himself, either directly or indirectly in the manufacture, preparation, distribution or sale of serum in any way, mode or manner for the treatment of tuberculosis or pulmonary consumption, under the Paquin formula; that he would not use, in the prosecution and carrying on of the business of manufacture, preparing, distributing or selling any kind of serum in any mode or manner, for the treatment of tuberculosis or pulmonary consumption, the name or designation of 'Anti-Tubercle Serum;' that, for a period of one year next after the date of said agreement, he would not engage in the United States, in the manufacture, preparation, distribution or sale of any kind of serum in any way, mode or manner, for the treatment of tuberculosis or pulmonary consumption.

"That he bound himself for the period of one year from the date of said agreement, to remain out of the business of manufacturing, preparing, selling or distributing any kind of serum, substance or fluid, for the treatment of tuberculosis or pulmonary consumption, and during that time, in the United States, to not make himself, or through any person, any researches, studies or experiments of any kind or character, aiding or encouraging the same, or in connection therewith, and bound himself, during the said period, in the said country, not to offer or furnish himself, or through any other agency, or in any manner or form, financial aid, business encouragement or assistance, directly or indirectly, to any person to do the same; yet he, the said defendant, has, since the execution of said agreement, of November 7, 1895, and within the period of one year next thereafter, in the United States, directly or indirectly,

Vol 163 mo—7

through the agency of others, and through his own efforts, made and conducted researches, studies and experiments for the production of serum, for the treatment of pulmonary consumption, and has offered to furnish, and has furnished to others financial aid and business encouragement in that behalf; had endeavored, within the said period, to employ those whom he has himself termed experienced bacteriologists, to conduct, in the United States, the production of anti-tubercle serum, for the treatment of pulmonary consumption, and in that connection, had undoubtedly used and employed the term and designation of 'Anti-Tubercle Serum;' has persistently since the execution of said contract of November 7, 1895, described the production of serum under the Paquin formula, by plaintiffs and by the corporation which they control and conduct, as hereinbefore alleged; has, for the purpose of fraudulently hindering and preventing the sale of serum, prepared by plaintiffs for the treatment of pulmonary consumption, falsely represented to others, and caused representation of such character to be made, that the serum made by plaintiffs under the formula of Paquin is valueless, inefficient, and an imposition upon physicians and patients; has, by his own directions and efforts, and through the efforts of others in his behalf, prevented the sale, distribution and employment of the serum made by plaintiffs, and in all ways within his power, prevented plaintiffs from enjoying and receiving the benefits of the contract hereinbefore recited, of November 7, 1895. That all of the said acts and doings of the said defendant are contrary to equity and good conscience, and in violence of the rights of such plaintiffs.

"That plaintiffs, although they have made careful investigation, since the bringing of said suit upon said notes, for the purpose of showing actual damages under their counter-claim, have, from the nature of things, been unable to obtain facts upon

which a money calculation of loss to them can be properly based.

"That by reason of such circumstances, and the frauds of said defendant, before and after the execution of said contract, of November 7, 1895, the plaintiffs have no adequate remedy at law, and are remediless save in equity.

"Therefore, the premises considered, the plaintiffs pray that the defendant may be enjoined from the further prosecution of the suit now pending in the circuit court of St. Louis county, between the defendant and plaintiffs, upon the said note for twenty-five hundred dollars aforesaid; that defendant may be enjoined from selling, pledging, or otherwise disposing of the remaining notes given to him by plaintiff, as hereinbefore alleged, and that all other notes whether in suit or otherwise, may be ordered to be cancelled and surrendered to plaintiffs; that the contract of November 7, 1895, be cancelled, rescinded and for naught held; that an accounting be had between the parties in the premises, and that such sum as may have been obtained from plaintiffs by defendant, less such sum as he may be found entitled to credit for, be adjudged to be by him refunded to plaintiffs, and for all other and proper relief."

Defendant in his answer admitted the partnership contract of January 31, 1895, and the modifications of March 27, 1895, and of June 10, 1895, as pleaded in the petition. Admits that operations were carried on under said agreements until November 7, 1895, when the partnership was dissolved and defendant sold his interest therein as alleged in the petition and the articles of dissolution, and avers that he has fully kept and performed said agreement. Says he has no knowledge that prior to the dissolution plaintiff Owen was informed of the purpose of Paquin and himself to dissolve the partnership. Denies that he knew Owen was to succeed him in the partner-

ship and denies Owen advanced the $15,000 to pay for his interest or that he knew Owen advanced it. Says he has no knowledge sufficient to form a belief as to whether the covenants and agreements between defendant and Paquin were the principal consideration for Owen's advancement of the $15,000 and becoming security on Paquin's notes to defendant. Denies knowledge as to Paquin's sale to Owen of one-half interest in the business formerly conducted by Paquin and defendant, and of the formation of the corporation, and assignment to it of all the property, formulas, good-will, etc., of said firm. Admits that defendant has a suit pending in the circuit court on one of the promissory notes for $2,500 executed by Paquin and Owen as part consideration for the sale of defendant's share in the partnership. Pleads in defense of his contract with Dr. Crandall that he found Paquin was resorting to quack methods to advertise himself and his Anti-Tubercle Serum, greatly to "defendant's mortification and humiliation;" that he formed his partnership with Paquin on the representation he was a scientist, but soon discovered he did not have the apparatus for culturing bacilli of tuberculosis and was not following scientific methods, and that no fluid was used by Paquin or the firm for immunizing animals, but Paquin was practicing a fraud upon the public. He then charges Paquin with misconduct and misappropriation of the firm's moneys. Having lost confidence in Paquin, in September 1895, and while the partnership was still in existence he employed Dr. Crandall to make experiments for defendant to discover a scientific method of manufacturing an 'Anti-Tubercle Serum' of which he was fully informed. He denies that during the year following the dissolution he engaged directly or indirectly in experimenting to discover anti-tubercle serum, or violated the contract of dissolution in any manner.

The reply denied all the new matter alleged in the answer by way of defense.

I.   Waiving for the present the existence or non-existence of fraud by defendant in the contract of dissolution and in obtaining the contract price of his interest in the co-partnership with Paquin, plaintiff is met with the objection that, conceding the alleged fraud, he has not elected to rescind the said contract within a reasonable time and therefore he is remitted to his action for damages.   Unquestionably it is a general rule of law that a party who would rescind a contract which has been induced or procured by the fraud of the other party thereto must act promptly and make his election to rescind.   In this case the evidence showed and so the trial court found, that the plaintiffs discovered that defendant had entered into the written contract with Dr. Crandall just prior to the time when the cause on the note given by them to defendant was to be tried, and learned then for the first time, that at the very time the contract of dissolution was entered into, defendant was contriving by means of the said contract to defraud them of the benefits of the contract of dissolution and their purchase of the good-will of the business, and thereupon filed the bill in this case to restrain the further prosecution of the suit on said note and to cancel all three of said notes and to have the contract declared void and for an accounting.   The plaintiffs acted with promptness as soon as they discovered the fraud which entered into the contract of dissolution and sale of defendant's interest in the business.   There was no such delay in bringing the suit as will bar the remedy in equity and remit plaintiffs to their action for damages.

Again it is urged that because the plaintiffs herein, as defendants in the note suit, pleaded a failure of consideration and a counterclaim for damages by reason of such failure, they thereby waived their right to rescind and elected to stand upon

their counterclaim for damages.

As to this contention, the allegations in the petition and answer furnish all that is pertinent.

In their petition plaintiff's allege that "after the first note matured, November 9, 1896, suit was brought by defendant thereon against plaintiffs, Paquin and Owen, which was then pending in the circuit court of St. Louis county; that in their answer to the said action upon said note, at the time it was filed, being advised and informed only of breaches of said agreement of November 7, 1895, by defendant after its execution, the plaintiffs pleaded failure of consideration and a counterclaim for damages by reason of such breaches." It will be observed that this is admitted in the answer.

The answer to the suit on the note then, upon its face, only pleaded a failure of consideration and breach of the contract *after its execution.* The said allegations were clearly no ground for rescission as the counterclaim was only based upon the efforts of defendant, after the sale, to decry and destroy the good-will of the property he had sold plaintiffs.

That answer was filed in ignorance of fraud entering into and vitiating the contract itself, and it is too plain for argument that that election presupposed a knowledge of the two conditions or remedies before one can be said to elect the one in preference to the other. [Johnson-Brinkman Com. Co. v. Central Bank, 116 Mo. 558.] Taylor v. Short, 107 Mo. 384, is so essentially different in the facts upon which the opinion is predicated that it furnishes no basis for the contention made that plaintiffs here are estopped, by their answer to the note, to bring this suit. The discovery of the Crandall contract in this case was not a mere incident of the fraud going to the integrity of the contract itself of which plaintiffs already had other notice, but it was the first notice plaintiffs had of fraud entering into the execution of the contract. This is not an effort to rescind

by the discovery of another incident in the same fraud, but the prompt exercise of the right as soon as the fraud which would support a rescission was ascertained.

II.  Little stress is laid by defendant upon the real equity of the case.  His complaint relates wholly to the questions of practice.  The circuit court correctly ruled that the contract of dissolution bound defendant to do nothing, directly or indirectly, to interfere with the manufacture of anti-tubercle serum under Dr. Paquin's formula, and bound him to refrain from any prosecution by experiments to produce the same or a similar serum to the injury of the good-will of the business which he had sold to Paquin.

A court of conscience will not countenance the attempt he made by his secret contract with Dr. Crandall to undermine and destroy the very business he had sold to Paquin, after solemnly binding himself not to do so, and receiving the full consideration therefor.

Nor will a court of equity hesitate to pronounce the scheme to which he resorted to accomplish his end a fraud. However sincere his motives might have been in employing Dr. Crandall in making experiments to discover anti-toxine for tuberculosis during the partnership, the contract of November 7, 1895, plainly required that he should no longer prosecute such investigations during the year from November 7, 1895, to November 7, 1896.  Upon the merits of the case the equities were clearly with the plaintiffs.

III.  The great contention in the case is that the decree itself is erroneous for the reason that the rescission is not *in toto* and because defendant has not been restored to the *status quo* existing when the contract was made.

The general rule is that a court of equity in decreeing the rescission or cancellation of a contract must set aside the contract *in toto* or not at all, and will deny it where the parties

can not be substantially placed *in statu quo.* [Robinson v. Siple, 129 Mo. loc. cit. 220, 221.]

But it is also held that the fact that the *status quo* can not be restored will not prevent a rescission where such condition results from the fraud of the defendant, and without the fault of plaintiff.

In Robinson v. Siple, this court cited with approval Masson v. Bovet, 1 Denio, 69, in which the court, after stating that the general rule required plaintiff to restore what he has received upon the contract in order to rescind, says: "This is not exacted on account of any feeling of partiality or regard for the fraudulent party. The law cares very little what his loss may be, and exacts nothing for his sake. If, therefore, he has so entangled himself in the meshes of his own knavish plot, that the party defrauded can not unloose him, the fault is his own; and the law only requires the injured party to restore what he has received, and, as far as may be, undo what had been done in the execution of the contract. This is all that the party defrauded can do, and all that honesty and fairdealing require of him."

Nor was it necessary for plaintiffs to offer to restore the membership in the partnership, and the property of the partnership which had been consumed in ignorance of the fraud defendant had perpetrated on them. As said by SHERWOOD, J., in Whelan v. Reilly, 61 Mo. 569, "The true meaning of the rule that 'he who seeks equity must do equity' is simply this: that where a complainant comes before a court of conscience invoking its aid, such aid will not be granted except upon equitable terms. These terms will be imposed 'as the price of the decree it gives him.' The rule 'decides nothing in itself,' for you must first inquire what are the equities which the plaintiff must do in order to entitle him to the relief he seeks. Hanson v. Keating, 4 Hare, 1; Erwin v. Blake, 8 Pet. 18;

Story's Eq. Juris., sec. 64, and cases cited." [Hammon v. Pennock, 61 N. Y. 145.]

No more lucid exposition of the rule in equity has come under our observation than is found in the opinion of Chief Justice COOPER in Brown v. Norman, 65 Miss. 369. Referring to the distinction between a rescission by the party himself as a basis of an action at law, he says: "Since the law permits him to re-acquire this legal right, by his own act, it puts upon him the necessity of restitution of the thing received by him as a condition of the exercise of the right to avoid the contract. From necessity, the law knows nothing of compensation but requires restoration of the thing received, for to permit the plaintiff to determine what would be just compensation would be to make him judge in his own case. But in equity the complainant does not necessarily rescind and sue; *he may sue for rescission.* He is required to restore the consideration, not however as a condition of acquiring the right to sue, but because of the equitable maxim that he who seeks equity must do equity."

The learned chief justice then reviews the authorities as follows:

"In Barker v. Walters, 8 Beav. 92, and Jervis v. Berridge, Lr., 8 Ch. Appeal Cases, demurrers had been interposed to bills seeking rescission, on the ground that no offer was made to restore the *status quo.* It was held that it was unnecessary to do so, since the court, on final hearing, would require the complainant to do equity. In the latter case, Lord SELBORNE said: 'Upon principle there appears to be no good reason why a plaintiff in equity, suing upon equitable grounds, should be required, on the face of his bill, to submit to those terms which the court at the hearing may think it right to impose as the price of any relief to which he may be entitled.'

"In Savery v. King, 5 House of Lords, 627, the party seek-

ing rescission had disposed of the part of the property received by him (a policy of insurance), and on this branch of the case Lord CRANORTH 'said: 'The one remaining question is as to the terms on which relief ought to be given. With respect to the mortgage it is plain that Richard must, as far as possible, put Savery in the condition in which he must have been if no such mortgage had been made, and if his security had rested solely on the life of his father, and the several policies of insurance. One of the eleven policies of insurance was sold by Richard in January, 1846; it is impossible, therefore, as to that policy, to restore Mr. Savery exactly to the position in which he stood in 1835; but he can not· be˜heard to complain of this, for by the arrangement he had made or concurred in, he had led Richard to suppose that all the policies had become his own, and that he might deal with them as he thought fit; indeed he, himself, suggested a sale of one or more of them as a step which it might be advisable for Richard to take. All therefore, which can be done, as to the policy which was sold, is to charge Richard in account with Mr. Savery with the sum which it produced, together with interest from the time when it was sold.'

"In Warner v. Daniels, 1 Woodb. & M., the court directed in decreeing a rescission that the complainant should re-deliver to the defendant the property received (certain shares in an incorporated company), but that if it should appear that he had disposed of any of the shares, then that he should restore the value thereof with interest.

"In Myrick v. Jacks, 33 Ark. 425, the court said: 'It is no objection that complainant can not put Jacks entirely in *statu quo* on rescission. The change in condition of the property was brought about by persuasion to accomplish a transaction in which Jacks was a party, and before the fraud was discovered, and by the action of complainant in a matter she

did not understand. When courts can not place parties wholly in *statu quo*, they are not thereby precluded from granting relief against fraud. They may proceed to do so as nearly as possible, and make compensation.' See also, Gatling v. Newell, 9 Ind. 574; Crosland v. Hall, 33 N. J. Eq. 111.

"In Ogden v. Thornton, 30 N. J. Eq. 573, the court finding itself unable to rescind the contract because the fraud occurred after the conveyance, remanded the cause in order that the bill might be amended, so as to enforce a lien upon the property for the price at which it had been valued; the defendant by his fraud having prevented the complainant from receiving what he contracted she should have.

"Upon principle and authority we think it immaterial that the *status quo* can not be literally restored. The defendant by the grossest fraud seduced complainant to exchange his farm for mere moonshine. What he professed to give was in fact of no value to himself or to any one else; he simply placed complainant in a position to be rendered insolvent; for by his purchase he secured nothing, except what should remain of the partnership assets after payment of debts, and the firm being hopelessly insolvent, this right was of no value. It may also be noted that from the very moment of the execution of the contract it was impossible for the defendant to be placed in *statu quo*, either by the act of complainant, or by both his act and the consent of the defendant. The defendant had been a member of a partnership, and his act in selling his interest therein was a dissolution of the firm; he could not again become a member without the assent of Mangum and Butler, over whom neither the defendant nor complainant had control. By his own act therefrom a restoration of the *status quo* was made impossible."

These authorities emphasize what was said in Robinson v. Siple, that if the *status quo* of defendant can not be restored

as a result of his own fraudulent conduct and machinations it will not bar plaintiffs' right to such equitable relief as the court under the circumstances is able to award him.

As plaintiffs were ignorant of the fraudulent contract of defendant with Dr. Crandall, the perishable property, the immunized animals, were used in the business and could not be restored in kind nor could defendant be restored to a partnership which he had voluntarily dissolved, and as a result, a new partnership of Paquin & Owen formed, and that was finally dissolved, and the corporation formed which took over the assets. Under these circumstances the *status quo* could not be restored, but it is not true that plaintiffs are therefore remediless in a court of equity, especially where, as in this case, plaintiffs sought an accounting.

The plaintiffs did not seek a rescission of the contract merely. More definitely speaking, they sought a cancellation of the three outstanding notes which they had been induced by the fraud of defendant to execute to him, and also for an accounting.

Owing to the peculiar nature of the business and the secret efforts of defendant to decry and destroy it, the circuit court found itself unable to state an account, but it had no difficulty in finding that the notes which plaintiffs asked to have cancelled, were procured by fraud, and that they at least should be cancelled.

This left defendant with $15,000 in his pocket for property which he had on various occasions asserted to be without value. Because the court can not restore the good-will of the business and estimate the damage which defendant by his fraud caused plaintiffs, is no reason why a court of equity may not cancel the executory contracts which are the outgrowth of that fraud.

Defendant invokes the general rule that a court of chan-

cery, in decreeing a cancellation of an instrument or contract, must set aside the contract *in toto* or not at all.

We have seen, however, that owing to the fraud practiced by defendant on plaintiffs, it was impossible to restore the parties to the exact position in which they were when the contract of dissolution was entered into, and the learned circuit court was confronted with the difficulty that, owing to the secret assaults of defendant upon the business which he had sold to plaintiffs, neither a jury nor a master could state an account with any accuracy between the parties. It found defendant in possession still .of the $15,000 cash paid him by plaintiffs, the amount by him invested in the partnership, and the three notes for the deferred payments, and the plaintiffs and the corporation in the possession of the formula, and the right to carry on the business, and under these circumstances it could only approximate justice by leaving defendant with $15,000 paid him for the property which they could not restore to him on account of his fraud, but denying him the right to collect the notes which the court found were procured by fraud. Under the peculiar circumstances of the case it is difficult to see what more equitable decree the court could have rendered. Certainly defendant is in no attitude to complain, because he was not required to restore the $15,000 also..

As said by Judge STORY in his Equity Jurisprudence (13 Ed.), vol. 1, section 439, "If a decree were in all cases required to be given in a prescribed form, the remedial justice would necessarily be very imperfect, and often wholly beside the merits of the case. Accident, mistake, and fraud are of an infinite variety in form, character, and circumstances, and are incapable of being adjusted by any single and uniform rule...... The beautiful character or pervading excellency, if one may say so of equity jurisprudence, is, that it varies its adjustments and proportions so as to meet the very form and pressure

of each particular case in all its complex habitudes."

In this case the decree arrived as nearly to the equity of the case as the circumstances would admit and was one certainly of which defendant ought not to complain, and it is accordingly affirmed. *Sherwood, P. J.*, and *Burgess, J.*, concur.

### SEPARATE OPINION.

SHERWOOD, P. J.—Speaking for myself alone, I desire to call attention to the fact that the doctrine announced in Whelan v. Reilly, 61 Mo. 565, respecting the rule that "he who seeks equity must do equity," was overruled by the *force of numbers* in Kline v. Vogel, 90 Mo. loc. cit. 250. That doctrine, however, has survived that attack, as shown by the foregoing opinion, which shows, also, that the doctrine announced in Whelan v. Reilly, has received the sanction of those, both in England and in this country, whose opinions are really deemed worthy of respect. Of course, it is easy enough to brush aside any opinion, with votes enough to do it with.

It is also proper to call attention to the fact that in the Kline-Vogel case, loc. cit. 250, 251, it is said in the majority opinion:

"Again, this court has decided on several occasions that our present statute of limitations applies to equitable as well as legal causes of action. 50 Mo. 455; 61 Mo. 188. Those rulings, in my judgment, are correct, and ought not to be disturbed. I do not, therefore, agree to the proposition that when the relief sought is based upon a right, purely equitable, that the court acts outside of and independent of the statute of limitations, for I understand the proposition to state, and to be intended to include, the doctrine that the court in that class of actions may even lengthen the statutory period within which such an action may be brought."

Speed v. Terminal Ry. Co.

But in the subsequent case of Kroenung v. Goehri, 112 Mo. loc. cit. 648, it was said by the writer of the majority opinion just mentioned:

"A court of equity will refuse relief where the party has slept upon his rights for an unreasonable length of time, and this, too, without regard to the statute of limitations. In other words, a court of equity will often refuse relief, because of delay in bringing the suit, though the period of delay is less than that prescribed by the statute of limitations."

But no hint was given of a contrary ruling having been made in the Kline-Vogel case. These two deliverances do not appear to *jibe* very well together. Courts of equity do "grant relief long after the bar of the statute is complete." [1 Elliott's Gen. Prac., sec. 302.]